F I L E D
CLERK, U.S. DISTRICT COURT

06/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

April 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>BRIAN JAVAADE MESHKIN,<br>STEVEN SAMUEL FICHTELBERG,<br>KIRT THOMAS PFAFF,<br>BRUCE WALTER GARDNER,<br>DANIEL RONALD KENDALL,<br>ABRAHAM ALAN CHERRICK,<br>LESTER ALAN ZUCKERMAN,<br>ASSAF TZUR GORDON, and<br>OSSAMA ANTOINE JAWHAR,<br>   aka "Tony,"<br>              Defendants. | No. 8:21-cr-00112-JLS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy to Defraud the United States and to Solicit, Receive, Offer, and Pay Illegal Remunerations; 42 U.S.C. § 1320a-7b(b)(2)(B): Offering and Paying Illegal Remunerations; 42 U.S.C. § 1320a-7b(b)(1)(B): Soliciting and Receiving Illegal Remunerations; 18 U.S.C. §§ 982(a)(7) and 982(b): Criminal Forfeiture] |

     The Grand Jury charges:

                    INTRODUCTORY ALLEGATIONS

     At times relevant to this Indictment:

A.   THE MEDICARE AND MEDICAID PROGRAMS

     1.   Medicare is a federal health care benefit program, affecting commerce, that provides benefits to individuals who are 65 years and older or disabled.  Medicare is administered by the Centers for

Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare is a "Federal health care program" as referenced in Title 42, United States Code, Section 1320a-7b(b)(f), and a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2.  Medicare pays only for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Participating providers are required to ensure that any services rendered to Medicare recipients (1) are provided economically and only when, and to the extent, medically necessary, (2) will be of a quality which meets professionally recognized standards of health care, and (3) will be supported by evidence of medical necessity. 42 U.S.C. § 1320c-5(a)(1).

3.  Health care providers that provide medical services that are reimbursed by Medicare are referred to as Medicare "providers."  To participate in Medicare, providers are required to submit applications in which the providers agree to comply with all Medicare-related laws and regulations, including the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), which proscribes the offering, payment, solicitation, or receipt of any remuneration in exchange for a patient referral or referral of other business for which payment may be made by any federal health care program.

4.  The purpose of the Anti-Kickback Statute is to ensure that referral decisions for federal health care programs are made solely with the goal of a patient's well-being.  Referring patients based on the expectation of personal profit corrupts the health care system because it encourages medical providers and others to make referral

2

decision for reasons relating to personal profit rather than a patient's best interests. The payment of kickbacks also corrupts the health care system because they have the effect of generating business for the dishonest provider at the expense of the honest provider who refuses to pay kickbacks.

5. The federal Medicaid program ("Medicaid") provides basic medical coverage for persons whose incomes are insufficient to meet the costs of necessary medical expenses. Medicaid operates as a joint federal and state healthcare program using both federal and state funds and is a "federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f).

B.  THE DEFENDANTS AND BACKGROUND

6. Proove Biosciences, Inc. ("Proove") was a company headquartered in Irvine, California. Proove operated a medical laboratory, Proove Medical Laboratories, Inc., also in Irvine, California.

7. Defendant BRIAN JAVAADE MESHKIN founded Proove Biosciences, Inc. and Proove Medical Laboratories, Inc., and was the companies' Chief Executive Officer.

8. In approximately July 2013, Proove applied to become a Medicare provider as an independent clinical laboratory. Defendant MESHKIN signed the application as the "Authorized Official." By signing as the "Authorized Official," defendant MESHKIN bound Proove to Medicare's laws, regulations and program instructions. Proove was subsequently approved as a Medicare provider and began billing Medicare in 2014 for services dating back to 2013.

9. Proove offered several pharmacogenetic tests which purportedly determined a patient's risk of abusing certain

3

prescription opioids and how patients metabolized certain drugs. Proove marketed these tests primarily to physicians who specialized in pain management.

10. Defendant STEVEN SAMUEL FICHTELBERG was employed at Proove from September 2014 to October 2017, and served as Proove's Vice President of Finance.

11. Defendant KIRT THOMAS PFAFF was employed at Proove from May 2016 to October 2017, and served as Proove's Vice President of Commercial Operations.

12. Defendant BRUCE WALTER GARDNER worked at Proove from January 2012 until August 2015, and served in various positions, including Vice President of Sales and Marketing, Vice President of Customer Service and Account Management, and Vice President of Strategic Operations.

13. Defendants DANIEL RONALD KENDALL, ABRAHAM ALAN CHERRICK and ASSAF TZUR GORDON were physicians and shareholders in Physical Medical Associates, Ltd. ("PMA"), a physician group located in the Commonwealth of Virginia. PMA was affiliated with National Spine and Pain Center, LLC ("NSPC"), an administrative services organization. PMA physicians provided medical care in Virginia at locations branded as a "National Spine & Pain Center." Defendant LESTER ALAN ZUCKERMAN was a member of NSPC's Board of Directors and its Chief Medical Officer.

14. Defendant OSSAMA ANTOINE JAWHAR, also known as "Tony," operated Advanced Medical Systems, a medical sales and marketing organization. Defendant JAWHAR promoted Proove's genetic testing to physicians. Defendant JAWHAR was later employed as a sales

4

representative for Proove from approximately September 2016 to February 2017.

## COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

15. The Grand Jury re-alleges paragraphs 1 through 14 of this Indictment here.

A. <u>OBJECTS OF THE CONSPIRACY</u>

16. Beginning at least as early as 2013, and continuing until in or around June 2017, in Orange County, within the Central District of California, and elsewhere, defendants BRIAN JAVAADE MESHKIN, STEVEN SAMUEL FICHTELBERG, KIRT THOMAS PFAFF, BRUCE WALTER GARDNER, DANIEL RONALD KENDALL, ABRAHAM ALAN CHERRICK, LESTER ALAN ZUCKERMAN, ASSAF TZUR GORDON, and OSSAMA ANTOINE JAWHAR, also known as "Tony," knowingly and intentionally conspired with each other and with others known and unknown to the Grand Jury to:

  a. Defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid programs; and

  b. Commit certain offenses against the United States, that is, violations of Title 42, United States Code, Section 1320a-7b(b)(1)(B) (soliciting and receiving remunerations), and Title 42, United States Code, Section 1320a-7b(b)(2)(B) (offering and paying remunerations).

B. **MANNER AND MEANS OF THE CONSPIRACY**

17. In furtherance of their conspiracy, and to effect its objects, defendants MESHKIN, FICHTELBERG, PFAFF, GARDNER, ZUCKERMAN, KENDALL, CHERRICK, GORDON, and JAWHAR used the following manner and means, among others:

   a. Defendant MESHKIN devised and implemented a scheme to induce physicians to order Proove's genetic tests for Medicare and Medicaid beneficiaries by paying physicians a bribe or kickback in the amount of approximately $100 to $150 for each test that physicians ordered.

   b. Defendants MESHKIN, GARDNER, and JAWHAR marketed Proove's genetic tests to physicians using the kickback or bribe as a financial incentive for physicians to order the tests.

   c. To conceal the true nature of the bribes and kickbacks, defendants MESHKIN, FICHTELBERG, PFAFF, GARDNER, KENDALL, CHERRICK, ZUCKERMAN, GORDON, and JAWHAR falsely characterized the payments as clinical research fees. As a part of the scheme, Proove employees completed clinical research forms that were supposedly being completed by the physicians, and physicians signed falsified time sheets overstating the amount of time that the physicians spent working on anything related to Proove's genetic testing or any related clinical research.

   d. As a part of the scheme, defendants MESHKIN, FICHTELBERG, and PFAFF leveraged outstanding kickback payments owed to physicians to demand that physicians order more tests. Likewise, when Proove's kickback payments were delayed, doctors, including defendants KENDALL and CHERRICK, demanded that Proove pay them before they would order more tests. For example, as NSPC's Chief Medical Officer,

6

defendant ZUCKERMAN directed that NSPC would not offer Proove's genetic tests to patients at certain NSPC medical practices unless NSPC was paid the kickbacks for the "clinical research" that NSPC's physicians had supposedly completed. This rendered the payment of the kickback, and not medical necessity, as the single overriding factor in the determination of whether certain NSPC patients were offered Proove's genetic tests.

   e. Under defendant MESHKIN's supervision, and with the help of defendants FICHTELBERG and PFAFF, doctors were given letter grades (A, B, C, etc.) based upon whether they were still actively ordering tests and had patients left in their office who could be tested. Doctors who were actively ordering tests and were willing to order even more were given "A" or "A+" grades. Doctors who had stopped ordering or had tested all their patients were considered "inactive" and given lower grades. Doctors who received "A" or "A+" grades were paid promptly to ensure that they continued to order more tests. Payments to doctors with lower grades were delayed or never made at all.

   f. Using the manner and means described above, and at the direction of defendant MESHKIN, Proove submitted approximately $45 million in claims to Medicare for genetic tests that were tainted by illegal kickbacks. Between 2013 and 2017, Medicare paid Proove approximately $20 million. From 2013 to 2017, Proove paid doctors at least $3.5 million in kickbacks to induce them to order Proove's genetic tests. Using the same manner and means, Proove submitted over $1 million in claims to the Ohio Medicaid program administered by the Ohio Department of Medicaid that resulted in Proove being paid approximately $171,268.45.

7

    g. Defendants KENDALL, CHERRICK, GORDON, and ZUCKERMAN promoted Proove's genetic testing at NSPC over genetic tests offered by other companies based upon the kickbacks that NSPC received from Proove. Physicians at NSPC ordered Proove genetics tests that caused Proove to submit approximately $4.5 million in Medicare claims. Medicare paid Proove a total of approximately $4 million for those claims. Proove, at defendant MESHKIN's direction, paid physicians at NSPC a total of $1.1 million in kickbacks.

C. <u>OVERT ACTS</u>

  18. On or about the following dates, in furtherance of the conspiracy and to effect and accomplish the objects thereof, defendants MESHKIN, FICHTELBERG, PFAFF, GARDNER, KENDALL, CHERRICK, ZUCKERMAN, GORDON, and JAWHAR, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California and elsewhere:

  <u>Overt Act No. 1</u>: On or about July 8, 2013, defendant MESHKIN met with two medical marketers, one of whom was cooperating with law enforcement. Defendant MESHKIN explained how he intended to pay doctors clinical research fees to promote Proove's genetic tests. Defendant MESHKIN acknowledged that there were competitors but that, "off the record, we [Proove] pay the doctors more."

  <u>Overt Act No. 2</u>: On or about February 25, 2014, defendant GARDNER met with a medical professional and explained that to receive the $150 kickback in the form of a clinical research fee, physicians only needed to order one of Proove's tests. Defendant GARDNER said, "if you strip it all away, all you have to do is order the test. Now whether you take the test report and throw it in the trash or never use it, that's not up to us."

8

<u>Overt Act No. 3</u>:  In or about September 2013, defendant KENDALL spoke with a Proove representative about Proove's genetic testing and the potential kickbacks for physicians at NSPC.  Defendant KENDALL took notes of the meeting which stated, "Proove Biosciences $300/patient profit - $150/test for 2 tests/patient.  Calculated as $150/hour/test."  In his notes, defendant KENDALL calculated the possible financial upside to NSPC at $8.64 million per year.

<u>Overt Act No. 4</u>:  On February 28, 2014, defendant KENDALL sent an email within NSPC which said, "It seems like most genetics companies are trying to jump on Proove's bandwagon with the 'studies'.  Even the one I trialed here in house . . . with 25 pts just email me stating we will pay you 75 bucks for every patient over 65.  Same thing from another company . . . .  It looks like this study protocol is through most of them to be competitive.  Proove still pays more.  (300) 150 x 2."

<u>Overt Act No. 5</u>:  On March 6, 2014, defendant KENDALL emailed defendants GORDON and ZUCKERMAN, and another individual, "[Another genetics testing company] is doing a similar study as well that they contacted me on, however it was only 75 bucks per case.  I still like Proove since theyre [sic] studies can be done on Medicare, and all Federal Programs, and any payer that we see fit and pay us 300 (150x2).  I like [competing medical marketer], but I think hes behind a few bucks on this one."

<u>Overt Act No. 6</u>:  On April 25, 2014, defendant GORDON emailed defendants MESHKIN and KENDALL to recommend to defendant MESHKIN that Proove recruit defendant CHERRICK to promote Proove.  Defendant GORDON encouraged defendant MESHKIN to purchase defendant CHERRICK some "great" Washington Nationals baseball tickets.

9

Overt Act No. 7:  On September 17, 2014, defendant KENDALL emailed defendants GORDON, JAWHAR, and CHERRICK that he had been averaging 10-12 patients per day and that participating in Proove's supposed clinical research program had "not affected productivity."

Overt Act No. 8:  On October 21, 2014, defendant KENDALL sent an email to defendant MESHKIN asking defendant MESHKIN to increase the kickbacks to NSPC doctors to "motivate" them to order Proove's tests and participate in the sham clinical research program.

Overt Act No. 9:  On October 29, 2014, defendant KENDALL emailed defendant MESHKIN, "[D]o you think you will be able to get the number up a bit?  (from 100 to 125)  The reason is the doctors only get 35% of their collections and the rest goes to the company . . . so each dollar will count to motivate the participation."

Overt Act No. 10:  On March 20, 2015, defendant KENDALL emailed defendant GORDON and others at NSPC advocating for the expansion of Proove testing at NSPC instead of a competing proposal to open an in-house genetic testing lab.  Defendant KENDALL emphasized that the Proove testing could "definitely bring a couple million to the bottom line."  Defendant GORDON responded there was "no effort" involved with Proove.  Defendant GORDON stated, "This is a perfect case of – Pigs gets fat, hogs get slaughtered . . . go with proove."

Overt Act No. 11:  On May 11, 2015, defendant KENDALL emailed numerous other physicians at NSPC to promote Proove.  Defendant KENDALL explained that his day to day routine had "not been affected in any way," and that he was collecting "10k a month" from Proove.

Overt Act No. 12:  On or about approximately December 16, 2015, defendant CHERRICK sent the following message to defendant JAWHAR, "I have been waiting to get paid for ad[visory] board from two months

ago[.] Please check into this . . . . As of Monday I am stopping all tests until this gets resolved[.]"

Overt Act No. 13: On January 21, 2016, a Proove employee emailed defendant CHERRICK, "We really just need NSPC doctors to test more patients to be candid. I'm hearing that most of the NSPC providers are sending very few patients . . . . With all the new clinics we've added our numbers have not really grown." Defendant CHERRICK responded, "Ok, I will talk with les Zuckerman. Bring it up on our next board meeting[.]"

Overt Act No. 14: On February 19, 2016, defendant KENDALL emailed defendants ZUCKERMAN and GORDON, and others, that NSPC should consider halting Proove testing for a week as a "warning shot" to Proove for being behind in its payments to NSPC. Defendant ZUCKERMAN responded, "the 'warning shot' I'd suggest right now is that we don't allow Proove to place research assistants in additional sites . . . at least until they have caught up payments through the end of '15."

Overt Act No. 15: On or about February 8, 2016, defendant KENDALL emailed defendant JAWHAR and others about Proove's failure to pay NSPC, "Im not sure what is going on, but this is an embarrassment that our company has not been paid. I received my last qtr statement, so Oct through Dec WITHOUT payments? Seriously?? Our whole company? Is this a joke? Im sticking up for the company and this SHIT is going on? WHAT THE HELL IS WRONG WITH PROOVE? If they were one month behind, I would have expected to be in the loop, I will kick everyones ass out of the company that works for Proove today if I don't get an answer."

Overt Act No. 16: On or about March 15, 2016, defendant MESHKIN emailed representatives of NSPC: "Thanks for the email. We need your
11

help.  Please look into the issue of volume.  We get a ton of emails about payment from you guys, but your volume keeps going down.  It's down 50% from last month. . . . .  [A] 50% reduction in volume is completely unacceptable from our standpoint.  I would expect with more sites coming on line, and more investment in staffing and supplies from Proove, that it would result in higher volume – not lower volume from NSPC.  If we could spend a little more time working on performance and volume, everything would work more effectively."

    Overt Act No. 17:  On June 16, 2016, defendant PFAFF received an email requesting payment from a doctor who indicated that he [the doctor] would continue testing with Proove if he received his payment. Defendant PFAFF forwarded the email to defendant FICHTELBERG, who responded, "Get the physicians ordering history.  That will inform the discussion."

    Overt Act No. 18:  On January 6, 2017, defendant PFAFF emailed defendants FICHTELBERG and MESHKIN, "I have had more than a handful of accounts stop doing profiles until compensation is made . . . multiple clinicians are refusing to order until they get compensated . . . ."

    Overt Act No. 19:  On January 8, 2017, defendant PFAFF emailed defendant MESHKIN, "Just a heads up . . . First week of January the volume is really low. . . .  Many clinics are not writing until payments are made."

    Overt Act Nos. 20 through 39:  The kickback transactions charged in Counts Two through Twenty-One of this Indictment are also alleged as overt acts in furtherance of the conspiracy.

COUNTS TWO THROUGH ELEVEN

[42 U.S.C. § 1320a-7b(b)(2)(B); 18 U.S.C. § 2(a)]

[DEFENDANTS MESHKIN, FICHTELBERG, PFAFF, AND JAWHAR]

19. The Grand Jury re-alleges paragraphs 1 through 15 and 17 through 18 of this Indictment here.

20. On or about the dates specified below, in the Central District of California, and elsewhere, defendants BRIAN JAVAADE MESHKIN, STEVEN SAMUEL FICHTELBERG, KIRT THOMAS PFAFF, and OSSAMA ANTOINE JAWHAR, also known as "Tony," knowingly and willfully offered and paid remuneration (including kickbacks and bribes), directly and indirectly, overtly and covertly, in cash and in kind, in the following amounts and using the check numbers specified below, issued by Proove Biosciences, Inc. and payable to Physician Medical Associates, c/o National Spine and Pain Centers, to induce such persons to order a service for which payment may be made in whole or in part under Medicare, a Federal health care program:

| Count | Check No. | Date | Amount |
| --- | --- | --- | --- |
| TWO | 012092 | 06/21/16 | $81,075.73 |
| THREE | 012347 | 07/22/16 | $83,134.71 |
| FOUR | 012622 | 08/18/16 | $94,110.60 |
| FIVE | 012768 | 8/30/16 | $1,363.32 |
| SIX | 012915 | 9/16/16 | $78,772.42 |
| SEVEN | 013054 | 9/30/16 | $959.98 |
| EIGHT | 013283 | 10/28/16 | $96,039.02 |
| NINE | 013565 | 12/1/16 | $109,535.62 |
| TEN | 014046 | 2/17/17 | $356.66 |
| ELEVEN | 014148 | 3/3/17 | $1,236.66 |

COUNTS TWELVE THROUGH TWENTY-ONE

[42 U.S.C. § 1320a-7b(b)(1)(B); 18 U.S.C. § 2(a)]

[DEFENDANTS KENDALL, CHERRICK, ZUCKERMAN, AND GORDON]

21. The Grand Jury re-alleges paragraphs 1 through 15 and 17 through 18 of this Indictment here.

22. On or about the dates specified below, in the Central District of California, and elsewhere, defendants DANIEL RONALD KENDALL, ABRAHAM ALAN CHERRICK, LESTER ALAN ZUCKERMAN, and ASSAF TZUR GORDON knowingly and willfully solicited and received remuneration (including kickbacks and bribes), directly and indirectly, overtly and covertly, in cash and in kind, in the following amounts and using the check numbers specified below, issued by Proove Biosciences, Inc. and payable to Physician Medical Associates, c/o National Spine and Pain Centers, in return for ordering a service for which payment may be made in whole or in part under Medicare, a Federal health care program:

| Count | Check No. | Date | Amount |
|---|---|---|---|
| TWELVE | 012092 | 6/21/16 | $81,075.73 |
| THIRTEEN | 012347 | 7/22/16 | $83,134.71 |
| FOURTEEN | 012622 | 8/18/16 | $94,110.60 |
| FIFTEEN | 012768 | 8/30/16 | $1,363.32 |
| SIXTEEN | 012915 | 9/16/16 | 78,772.42 |
| SEVENTEEN | 013054 | 9/30/16 | $959.98 |
| EIGHTEEN | 013283 | 10/28/16 | $96,039.02 |
| NINETEEN | 013565 | 12/1/16 | $109,535.62 |
| TWENTY | 014046 | 2/17/17 | $356.66 |
| TWENTY-ONE | 014148 | 3/3/17 | $1,236.66 |

FORFEITURE ALLEGATIONS

[18 U.S.C. §§ 982(a)(7), 982(b)]

23. The Grand Jury re-alleges paragraphs 1 through 22 of this Indictment here for purposes of seeking forfeiture from defendants pursuant to Title 18, United States Code, Sections 982(a)(7) and 982(b).

24. Upon conviction of any of the offenses set forth in Counts One through Twenty-One, defendants shall forfeit to the United States all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

25. If any of the property described above, as a result of any act or omission of the defendants:

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third party;

   c.  has been placed beyond the jurisdiction of the court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section

///

///

///

///

///

853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

/s/

Foreperson

TRACY L. WILKISON
Acting United States Attorney
Central District of California

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
Central District of California

JOSEPH S. GREEN
Assistant United States Attorney
Southern District of California